## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

| | |
|---|---|
| **IAN CHADO**<br>414 Poole Road, Unit B1<br>Westminster, Maryland 21157<br>*Resident of Carroll County* | Collective/Class Action Claim |
| **NANCY NGUYEN**<br>6721 Quiet Hours<br>Columbia, Maryland 21045<br>*Resident of Harford County* | |
| and | Jury Trial Requested |
| **WILLIAM RUSH**<br>400 Symphony Circle<br>Hunt Valley, Maryland 21030<br>*Resident of Baltimore County* | |
| Plaintiffs, | |
| ***Individually and on Behalf of All***<br>***Similarly Situated Employees*** | |
| v. | Civil Action No.: |
| **NATIONAL AUTO INSPECTIONS, LLC**<br>**T/A CARCHEX**<br>10950 Gilroy Road, Suite D<br>Hunt Valley, Maryland 21031 | |
| Serve:  Jason Goldsmith, R.A.<br>          10950 Gilroy Road, Suite D<br>          Hunt Valley, Maryland 21031 | |
| Defendant. | |

## COLLECTIVE AND CLASS COMPLAINT FOR WAGES OWED

IAN CHADO, NANCY NGUYEN and WILLIAM RUSH, Plaintiffs, by and through their

undersigned counsel and The Law Offices of Peter T. Nicholl, on behalf of themselves and all

others similarly situated, hereby submit their Complaint against NATIONAL AUTO

INSPECTIONS, LLC T/A CARCHEX, Defendant, to recover unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter, "FLSA"); unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.* (hereinafter, "MWHL"); and unpaid wages, treble damages, interest, reasonable attorneys' fees and costs under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq.* (hereinafter, "MWPCL"), and in support thereof, state as follows:

## INTRODUCTION AND BACKGROUND

Defendant National Auto Inspections, LLC, t/a CARCHEX, (hereinafter, "CARCHEX" or "Defendant") is in the business of selling vehicle related insurance products. Defendant's primary product consists of Extended Vehicle Protection Plans (hereinafter, "EVPP"). EVPPs are warranties that replace a vehicle's manufacturer's warranty once it has expired. Defendant also offers roadside assistance plans, pre-purchase vehicle inspections and assistance with comparing insurance premiums. Defendant partners with numerous companies, including, but not limited to, CARFAX, Allstate and Edmunds.

To sell its products, Defendant owns and operates a call center. Defendant employs EVPP Specialists, also known as Vehicle Protection Specialists (hereinafter, "VPS"), collectively referred to as "Specialists," at its call center. Plaintiffs and others similarly situated over employed as Specialists. Plaintiffs and other Specialists were responsible for selling EVPPs, Defendant's primary product. Specialists made and received calls to and from Defendant's prospective customers. Outbound calls were generated from leads given to Specialists.  Leads originated from

several sources, including a prospective customer's online request for information through Defendant's website, direct mail to prospective customers and referrals from Defendant's partners.

Specialists were paid via a piece-rate payment structure, which included bonus incentives and a minimum guarantee. This structure was primarily based on the number of EVPPs or "units" that a Specialist sold. Specialists received a set amount per EVPP sold, regardless of the actual value of the EVPP. The amount solely depended on the type of EVPP sold.

Specialists were also entitled to bonuses for meeting certain goals. This included bonuses related to financing options, surcharges and gross profit shares. There were also bonuses based on the number of monthly and cumulative EVPPs sold. Defendant also offered bonuses to its top sellers.

Based on these incentives, Defendant fostered an environment that promoted long hours. To increase their sales, Defendant encouraged Plaintiffs and other Specialists to work through lunch, to work on the weekends and to work from home. It was common for Plaintiffs and other Specialists to work excessive hours. This was the only way they could attempt to meet Defendant's rigid sales goals. Working these long hours also served the dual purpose of avoiding any disciplinary action that resulted from not meeting their goals. These circumstances resulted in numerous weeks where Plaintiffs and other Specialists worked well over forty (40) hours. However, Defendant failed to offer any additional compensation to account for the overtime its Specialists worked.

Because Plaintiffs and other Specialists were paid on a piece rate basis, they were entitled to overtime compensation. Plaintiffs' and other Specialists' bonuses should have been added to their piece rate compensation for purposes of calculating their regular hourly rates. Plaintiffs and other Specialists were entitled to overtime pay based on those rates. The fact that Plaintiffs and

other Specialists received a minimum guarantee during certain weeks did not change their entitlement to overtime.

Defendant was well aware of the overtime hours its Specialists worked. Plaintiffs and other Specialists did not perform any duties that would exempt them from the overtime requirements of the FLSA or MWHL. The nature of Defendant's business also did not qualify it for any exemptions contained therein.  Therefore, Plaintiffs and other Specialists were entitled to overtime pay. By not providing its Specialists with such pay, Defendant willfully evaded the payment of wages owed to Plaintiffs and others similarly situated.  This conflicts with the standards set forth by the FLSA, MWHL and the MWPCL. Defendant is currently engaged in this unlawful activity. This mandated the filing of this Complaint.

## THE PARTIES

1.      Plaintiff Ian Chado (hereinafter, "Chado") is an adult resident of Carroll County, Maryland.

2.      Plaintiff Nancy Nguyen (hereinafter, "Nguyen") is an adult resident of Harford County, Maryland.

3.      Plaintiff William Rush (hereinafter, "Rush") is an adult resident of Baltimore County, Maryland.

4.      Defendant National Auto Inspections, LLC, t/a CARCHEX, (hereinafter, "Defendant" and/or "CARCHEX") is an incorporated for-profit business. [1]

5.      Defendant's principle office is in Hunt Valley, Maryland.

_____

[1] Any reference to Defendant shall include its corporate officers and all those empowered to act as agents of the corporation, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency.  To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendant."

6.      Defendant is engaged in the sale of vehicle-related insurance products.

7.      Defendant sells Extended Vehicle Protection ("EVPP") plans, roadside assistance plans, as well as pre-purchase inspections. With the help of its partners, Defendant also assists its customers with acquiring car insurance.

8.      To sell its products and those of its partners, Defendant owns and operates a call center.

9.      Defendant conducts business throughout various regions across the United States.

10.     Due to the nature of its business, Defendant is subject to the FLSA, MWHL and the MWPCL.[2]

11.     Defendant is subject to the FLSA, MWHL and the MWPCL due to the amount in revenues generated.  Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

12.     At all times relevant to this Complaint, Plaintiffs engaged in interstate commerce. This was based on the nature of the duties they performed as part of their employment with Defendant. Throughout their employment, Plaintiffs communicated with consumers in various states for purposes of making sales.

13.     At all times throughout their employment, Plaintiffs worked for Defendant, who fell within the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

---

[2] Defendant does not qualify as a retail or service establishment.  Less than seventy-five percent (75%) of its business consists of the sale of goods or services that have been produced in interstate commerce.

14.     Plaintiffs and others similarly situated worked as non-exempt employees for Defendant.  The duties assigned to Plaintiffs and all others similarly situated did not satisfy the duties tests contained within the exemptions specified in the FLSA, MWHL or the MWPCL.

15.     From August 21, 2015 to July 3, 2017, Plaintiff Chado was employed by Defendant as an EVPP Specialist, also known as a Vehicle Protection Specialist ("VPS") ( collectively referred to as "Specialist").

16.     From approximately December 2015 to June 2016, Plaintiff Nguyen was employed by Defendant as a Specialist.

17.     From approximately March 2013 to June 2016, Plaintiff Rush was employed by Defendant as a Specialist.

18.     Defendant controlled the administration of its business and set employee schedules, including those of Plaintiffs and other Specialists.

19.     Defendant's agents were, individually and together, actively engaged in the management and direction of Plaintiffs and other similarly situated employees.

20.     Defendant possessed and exercised authority to determine the hours worked by Plaintiffs and other Specialists.

21.     Defendant had the authority to control Plaintiffs' tasks and the tasks of others similarly situated.

22.     Defendant had and exercised the power and authority to change the course of Plaintiffs' and other similarly situated employees' duties.

23.     Plaintiffs and members of the putative classes recognized Defendant's authority and obeyed Defendant's instructions.

24.     Defendant made all decisions relating to Plaintiffs' and other similarly situated employees' rates and methods of pay.

## JURISDICTION AND VENUE

25.     Original jurisdiction in this Honorable Court is expressly provided by FLSA, 29 U.S.C. § 207, *et seq*.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

26.     Discretionary supplemental jurisdiction of Plaintiffs' Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiffs' federal claims are based.

27.     Furthermore, no reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

28.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.

29.     This Honorable Court has personal jurisdiction over Defendant; Defendant is a limited liability company organized under the laws of Maryland and Defendant conducts sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

30.     Defendant is in the business of selling various automobile related insurance products. Defendant's primary product consists of Extended Vehicle Protection Plans (hereinafter,

"EVPPs"). EVPPs are warranties that replace the manufacturer warranty on a vehicle once that warranty has expired.

31.     Plaintiffs and similarly situated employees were hired to work as EVPP Specialists, also known as Vehicle Protection Specialists ("VPS") (collectively referred to as, "Specialists"). They all worked out of Defendant's call center in Hunt Valley, Maryland.

32.     Specialists were all charged with selling the products offered by Defendant and its partners. This was accomplished through making and receiving calls to and from Defendant's prospective customers. Outbound calls were generated from leads from various sources. These sources include direct mail, referrals from Defendants partners and a potential customer's request for information through Defendant's website.

33.     During the course of a sale, Plaintiffs and other Specialists were required to take down and enter a prospective customer's information. They were also required to read from scripts developed by Defendant.

34.     Defendant required Plaintiff and other Specialists to follow the terms of each script precisely. Failure to do so would result in penalties.[3]

35.     Plaintiffs and other Specialists did not have any discretion. They lacked independent judgement. They were required to follow all of Defendant's instructions. They had no authority to act on their own.

36.     While performing their daily tasks, Plaintiffs and other similarly situated employees did not require any specialized training or advanced knowledge.

---

[3] For instance, if Plaintiffs or other Specialists failed to read from Defendant's "closing script," they suffered a twenty-five-dollar ($25.00) deduction from their pay for each call where they failed to do so.

37.     Plaintiffs and others similarly situated did not perform any analysis.

38.     Plaintiffs and other Specialists did not interpret any information.

39.     Plaintiffs and others Specialists did not write any reports.

40.     Plaintiffs and other Specialists performed their duties to the extent required by Defendant.

41.     Plaintiffs and other Specialists satisfied the requirements of their job and adequately performed their duties to benefit Defendant, as well as the Defendant's customers.

42.     Defendant paid its Specialists via a complex piece-rate structure. Included with this structure were bonus incentives and a minimum guarantee.

43.     Defendant's payment structure was primarily based on the number of EVPPs, or "units," that its Specialists sold.  Specialists received a set amount for each EVPP sold, regardless of the actual value of the EVPP.  The amount paid to Plaintiffs and other Specialists depended solely on the type of EVPP sold.

44.     Defendant offered five (5) levels of EVPPs: Titanium, Platinum, Gold, Silver and Bronze.  For Titanium, Platinum and Gold EVPPs, Plaintiffs and other Specialists received one hundred and twenty-five dollars ($125.00) for each unit sold. They received one hundred dollars ($100.00) for each Silver and fifty-five dollars ($55.00) for each Bronze EVPP sold.

45.     For certain categories of EVPPs, Plaintiffs and other Specialists received seventy-five dollars ($75.00) for each unit sold, regardless of the level.

46.     If the EVPP was attributable to a ridesharing vehicle, Plaintiffs and other Specialists received fifty dollars ($50.00) per unit.

47.     Defendant also offered various bonuses for meeting pre-determined sales goals. These bonuses included additions for financing options and surcharges. There was also a Monthly

Units Sold and a Cumulative Units Sold bonus. Defendant also offered a Top 5 Vehicle Protection Specialist and a Gross Profit Share bonus.

48.     Bonuses based on financing options primarily depended on whether the EVPP was paid in full. Bonuses based on additions for surcharges were dependent upon several factors. This included whether the EVPP was for a commercial or "high tech" vehicle, whether it covered a navigation system, the type of emissions of the covered vehicle and whether the EVPP included Key Guard protection (replacement value for stolen, damaged, or lost keys). Each option that Plaintiffs and other Specialists sold to customers was added to their bonus.

49.     Defendant's "Monthly Units Sold" bonus was based on the number of EVPPs sold per month.  The bonus payout was split into two (2) halves each month.  The first half was measured against half of the monthly goals set by Defendant.  If these goals were met, Plaintiff and other Specialists would receive a bonus for this period.  This bonus was subsequently deducted from their final monthly bonus, which was distributed on the fifteenth of the following month. This bonus was calculated based on the total number of EVPPs sold during the entire month.

50.     The "Cumulative Retention" bonus was based on the total number of EVPPs that Plaintiffs and other Specialists sold throughout their employment. They would receive a one (1) time bonus of one thousand dollars ($1,000.00) for the first hundred (100) units sold. They received five hundred dollars ($500.00) for every subsequent batch of one hundred (100) EVPPs sold.[4]

51.     The "Top 5 Protection Specialist" bonus was based on performance.  Each month, the five (5) Specialists who sold the most would split a proportional amount determined by Defendant.  Pursuant to the goal set for each month, Defendant would typically put in two dollars

---

[4] On September 1, 2016, Defendant increased its Cumulative Retention bonus. Plaintiffs and other Specialists started to receive six hundred dollars ($600.00) for every additional one hundred (100) units sold.

($2.00) per EVPP sold. Once that goal was exceeded, Defendant would put in five dollars ($5.00) for every additional EVPP sold.

52.     Plaintiffs and other Specialists were entitled to a "Gross Profit Sharing" bonus only if they met the minimum monthly goal of selling thirty-five (35) EVPPs for three (3) months straight.  Once this goal was met, they would receive a percentage based on the value of each EVPP sold that month. They typically received one point two-five percent (1.25%) for selling thirty-five (35) or more EVPPs. The percentage of their total volume of sales for the month that Plaintiffs and other Specialists received increased depending on how many EVPPs they sold. For instance, they would receive five percent (5%) of their monthly sales volume for selling eighty (80) or more EVPPs.

53.     Plaintiffs and other Specialists would lose the Gross Profit Sharing bonus if they failed to meet the minimum monthly threshold of selling thirty-five (35) EVPPs for a period of two (2) consecutive months. Specialists would also be charged back a portion of their paid bonus(es) if they did not meet their monthly requirements.

54.     All of these bonuses were subject to various deductions. This included deductions for cancellations made by customers within the first ninety (90) days of the policy. Deductions were also based on price matches and manager discounts, as well as for customers who participated in certain programs.  There were also deductions specific to violations of company sales policies. This included failing to read the closing script, submitting incorrect mileage reports and deductions relating to expenses incurred by a customer as a result of a Specialist's error.

55.     In addition to the bonuses described above, Defendant also paid Plaintiffs and other Specialists a "Guaranteed Minimum Commission" when their earned piece-rate and bonus payments that did not rise above a certain threshold.  The amount of the Guaranteed Minimum

Commission was set by Defendant. It would change each month during the first four (4) months of a Specialist's employment, after which it remained constant.  The guarantee was paid on a bi-monthly basis.  Each bi-monthly period, it had to be determined whether a Specialist was to be paid half of the Guaranteed Minimum Commission or the actual payment they earned.  The Specialist would receive the greater of the two (2).

56.     For the duration of their employment, Plaintiffs and all other Specialists were paid pursuant to the plan described above. This plan did not provide for any additional compensation during weeks where they worked over forty (40) hours.

57.     Plaintiffs and other Specialists consistently worked over forty (40) hours each week. Working overtime was integral to their employment.

58.     Plaintiffs were scheduled to work a minimum of forty-five (45) hours per week. This was based on working five (5) nine (9) hour shifts Monday through Friday.  Each shift was to include a one (1) hour break for lunch, however Plaintiffs and other Specialists routinely worked through lunch to cover Defendant's phones as well as increase their sales numbers.

59.     Plaintiffs and other Specialists were also scheduled to work on the weekends. They all had to work at least one (1) Saturday every three (3) weeks, which was also a nine (9) hour shift.

60.     During weeks when Plaintiffs and other Specialists were scheduled to work on Saturdays, they had to work a minimum of fifty-four (54) hours per week. Therefore, Plaintiffs and other Specialists consistently worked between forty-five (45) and fifty-four (54) hours each week as a result of their regular schedules.

61.     Plaintiffs and other Specialists were scheduled to work five (5) nine (9) hour shifts Monday through Friday. The start time for each shift was dependent upon Defendant's needs.

Some Specialists would begin their shifts at 8:00 a.m. Others would begin at 9:00 a.m. or 10:00 a.m. Some would begin even later. This resulted in Plaintiffs and other Specialists working staggered shifts.

62.     Due to working staggered shifts, the time that Plaintiffs' and other Specialists' shifts ended varied. Depending on the time they actually arrived to work, Plaintiffs and other Specialists would typically leave work between 5:00 p.m. to 8:00 p.m. Due to the demands of their employment, there were times when they left even later.

63.     Any time that the calendar days within a month ended on a Saturday or Sunday, Plaintiffs and other Specialists were all required to work that Saturday. They were required to work this extra Saturday in addition to the Saturdays that were already a part of their rotating schedules.[5] These weekend shifts caused Plaintiffs and other Specialists to consistently work far beyond forty (40) hours each week.

64.     There were other factors that caused Plaintiffs and other Specialists to work overtime regularly. Defendant fostered a competitive atmosphere amongst its Specialists. Defendant pushed its Specialists to increase their production by any means necessary.  This was accomplished through its pay structure, which focused primarily on production. The various bonuses Defendant offered its Specialists were based on high productivity.

65.     Defendant encouraged its Specialists to put in extra hours in order to produce more and more. Defendant stressed the importance of striving to go far beyond simply meeting minimum

---

[5] During the week, although Defendant occasionally allowed Plaintiffs and other Specialists to come in two (2) hours late each day to make up for the mandatory Saturday shift, Plaintiffs and other Specialists seldom, if ever, took advantage of this opportunity.  This resulted from both the threats and incentives employed by Defendant to encourage its Specialists to increase their production.  For Saturdays that fell at the end of the month, this scheduling opportunity was not offered to Specialists.

sales goals in order to earn extra money.  Defendant's bonus structure was developed in order to encourage its employees to work long hours.

66.     The financial incentives prompted many Specialists to work extended hours. They would routinely report to work prior to when their shifts were scheduled to begin. They would regularly leave work after the time their shifts were scheduled to end.

67.     It was also common for Plaintiffs and other Specialists to work on their days off. Some Specialists worked every Saturday in an attempt to increase their sales numbers. Many worked more Saturdays than their schedules required in hopes of earning bonuses. The same caused Plaintiffs and other Specialists to come in early and stay late.

68.     Plaintiffs and other Specialists also routinely worked through their scheduled lunches. They rarely took their one (1) hour break. This too was for purposes of increasing their production.  The potential to earn bonuses led Plaintiff and other Specialists to non-stop.

69.     Bonus potential also caused Plaintiffs and other Specialists to work from home. They consistently worked from home both before and after their scheduled shifts, in addition to days they were scheduled to be off.  Although Defendant's hours of operation were from 9:00 a.m. to 5:00 p.m. Monday through Friday, the time Plaintiffs and other Specialists were required to accept incoming calls, Defendant did not need to be open for business in order for its Specialists to be working.  This was because their duties did not solely consist of accepting inbound calls; Plaintiffs' and other Specialists' primary duty was to make outbound calls, which did not require Defendant's business to be open.

70.     To perform their duties, all that Plaintiffs and other Specialists needed was a working phone, a computer and an internet connection.  Specialists had access to these resources at home.  It enabled them to make contacts with potential customers at all times during the day.

Making sales to potential customers was the crux of a Specialist's duties. Thus, working from home became a routine part of their employment. This further increased the total number of overtime hours worked by Plaintiffs and other Specialists.

71.     Plaintiffs and other Specialists worked overtime for other reasons. They routinely worked hours outside of their schedules in order to make up for past or current deficits. Making up for these deficits caused Plaintiffs and other Specialists to regularly come in early and stay late. These conditions also caused them to frequently work on their days off.

72.     Specialists were disciplined for not meeting Defendant's minimum sales goals. To avoid disciplinary action, Plaintiffs and other Specialists were required to sell a minimum of thirty-five (35) EVPPs each month. Meeting this requirement was an arduous task. It forced Plaintiffs and other Specialists to work hours outside of their schedule.

73.     If Specialists failed to meet the minimum threshold for two (2) consecutive months, they were labeled as an "employee at risk." If an employee at risk failed to reach the thirty-five (35) EVPP minimum for a third (3rd) month, the employee was terminated.

74.     Fear of termination caused Plaintiffs and other Specialists to work extra hours. This threat caused them to routinely work hours outside of their schedule. This included working additional days.

75.     As a result of these conditions, Plaintiffs and other Specialists worked well over forty (40) hours each week.  They consistently worked as many as fifty-five (55) to sixty-five (65) hours each week.  There were times when they worked even more.

76.     Despite the fact that Plaintiffs and other Specialists consistently worked over forty (40) hours each week, they never received overtime compensation.

77.     Plaintiffs' and other Specialists' bonuses should have been added to their piece rate compensation in order to calculate their regular hourly rates.  Plaintiffs and other Specialists were entitled to overtime compensation based on those rates.

78.     Consequently, Plaintiffs and other Specialists were not compensated at a rate of "time and a half" their regular rates of pay. This occurred for the duration of their employment.

79.     There is no bona fide dispute that Plaintiffs and other Specialists are owed overtime wages for all hours worked over forty (40) in a workweek.

80.     The duties performed by Plaintiffs and others similarly situated did not implicate any exemptions contained within the FLSA, MWHL or the MWPCL.

81.     Although Defendant did not require Plaintiffs or other Specialists to keep track of their time, Defendant was well aware of the excessive hours that its Specialists worked. Defendant monitored the time that all of its Specialists made their first call and tracked the time and duration of the last call made by each Specialist.  This was true regardless of whether a Specialist was working at the office or from home.

82.     Thus, Defendant knew that Plaintiffs and other Specialists customarily worked well over forty (40) hours per week.

83.     Defendant suffered and/or permitted Plaintiffs and other similarly situated employees to work these overtime hours.

84.     Acting without good faith, Defendant withheld the overtime wages owed to Plaintiffs and other Specialists, even after they inquired about the wages missing from their pay-checks.

85.     Consequently, on behalf of themselves and all those similarly situated, Plaintiffs seek the wages to which they are entitled and other available relief through this Complaint.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

86. Plaintiffs and other similarly situated employees work or worked as Extended Vehicle Protection Plan Specialists (hereinafter, "EVPP") and Vehicle Protection Specialists (hereinafter, "VPS") (hereinafter, collectively referred to as "Specialists") for Defendant. They were all employed to sell Defendant's primary product: EVPPs.

87. The FLSA requires employers to compensate non-exempt employees such as Plaintiffs and others similarly situated with overtime wages for all hours worked over forty (40) in a workweek.

88. Defendant knew that Plaintiffs and other similarly situated employees did not qualify for any exemption to the FLSA's overtime provisions.

89. Defendant knew that Plaintiffs and similarly situated employees typically worked over forty (40) hours per week.

90. Defendant suffered and/or permitted Plaintiffs and other Specialists to work more than forty (40) hours per week.

91. Defendant knew or should have known that Plaintiffs and other similarly situated employees were entitled to overtime pay for all hours worked over forty (40) in a workweek.

92. Regardless of the number of hours Plaintiffs and other similarly situated employees worked, Defendant did not pay them any additional pay for working over forty (40) hours.

93. Pursuant to the FLSA, Plaintiffs commence this collective action against Defendant on behalf of themselves and those similarly situated.

94. Plaintiffs demand damages reflecting an overtime rate of not less than one and a half (1.5) times their regular rate of pay for all hours worked over forty (40) in any workweek

within the applicable statute of limitations.  Plaintiffs make these same demands on behalf of all members of the putative Collective class.

95.   Plaintiffs consent to be party Plaintiffs in this matter.  Plaintiffs' consent forms are attached to this Complaint as Exhibits A-C.

96.   It is likely that other individuals will join Plaintiffs during the litigation of this matter and file written consents to "opt in" to this collective action.

97.   There are numerous similarly situated current and former employees of Defendant that have been harmed by Defendant's common scheme to underpay its employees and violate the FLSA. They are thereby fit for membership in the Collective class of similarly situated employees.

98.   These similarly situated persons are known to Defendant and are readily identifiable through Defendant's records.

99.   Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit as members of the Collective class.

100.   Upon information and belief, other similarly situated employees will choose to join Plaintiffs in this action against Defendant and opt in to this lawsuit to recover unpaid wages and other available relief.

**CLASS ACTION ALLEGATIONS UNDER MARYLAND WAGE LAWS**

101.   Plaintiffs bring this action Pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and other current and former employees that served as Specialists for Defendant and were subject to the following practices and policies:

102.   Denial of overtime wages under MWHL for hours worked over forty (40) in a single workweek; and

103.    Denial of all wages owed to Plaintiffs and other similarly situated Specialists at the termination of their employment in violation of the MWPCL.

104.    The classes Plaintiffs seek to represent are defined as:

*MWHL Class*

> All individuals who are or were employed by Defendant as Specialists for any period ranging from October 5, 2014 to the present and who were not paid an overtime rate of "time and a half" their regular rate for all hours worked over forty (40) in a workweek, in violation of MWHL.

*MWPCL Class*

> All individuals who were, but are no longer, employed by Defendant as Specialists for any period ranging from October 5, 2014 to the present, who were not paid an overtime rate of "time and a half" their regular rate for all hours worked over forty (40) in a workweek, in violation of MWHL and the FLSA, and thus did not receive all wages owed to them before the termination of their employment, in violation of the MWPCL.

105.    *Numerosity:* The individuals in the class are sufficiently numerous that joinder of all members is impracticable.  Although the precise number of such individuals is currently unknown, on information and belief, the class includes dozens of employees who are readily identifiable through Defendant's pay records.  Defendant employed dozens of Specialists across the state of Maryland.  Defendant services hundreds of customers throughout Maryland and across the United States through its Specialists.  Consequently, numerosity exists.

106.    *Commonality:* There are questions of law and fact common to the classes.  Among the common questions of law and fact applicable to Plaintiffs and the classes are:

a.    Whether the MWHL Class is similarly situated because they were subject to Defendant's common payment policies and practices;

b.    Whether Defendant employed the MWHL Class within the meaning of MWHL;

c.   Whether Defendant violated MWHL by failing to pay Plaintiffs and the MWHL
Class overtime compensation for hours worked in excess of forty (40) hours per
workweek;

d.   Whether Defendant's violations of MWHL were willful;

e.   Whether Defendant employed the MWPCL Class within the meaning of the
MWPCL;

f.   Whether Defendant failed to provide Plaintiffs and other members of the MWPCL
Class with all wages due at the time their employment ended in violation of the
MWPCL;

g.   Whether Defendant's violations of MWPCL were willful; and

h.   Whether Defendant is liable for damages claimed herein, including but not limited
to, compensatory, liquidated or treble, statutory, interest, costs and attorneys' fees.

107.   *Typicality:* Plaintiffs' claims are typical of those of the classes.  Specifically, each
and every class member of the MWHL Class and the MWPCL Class worked as a Specialist for
Defendant.  Each and every class member was required to work well over forty (40) hours per
workweek to keep up with Defendant's imposed schedule and regular understaffing.  Each class
member was paid on a piece-rate basis.  Each class member failed to receive extra compensation,
regardless of whether the class member worked over forty (40) hours per week.  Every member of
the MWPCL Class failed to receive all wages owed to them at the end of their employment.  As a
result, each and every class member suffered the same harm.  This was due to Defendant's failure
to pay a proper overtime premium for all hours worked in excess of forty (40) hours per workweek
and the subsequent failure to pay Plaintiffs and other members of the MWPCL Class all wages owed

to them at the conclusion of their employment.  This constitutes a direct violation of the MWHL, as well as a subsequent violation of the MWPCL.

108.    *Adequacy:* Plaintiffs will fully and adequately protect the interests of the classes. They seek the same recovery as the class, predicated upon the same violations of the law and the same damage theory.  Plaintiffs have also retained counsel who are qualified and experienced in the prosecution of statewide wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the classes.

109.    *Predominance:* The common issues of law and fact predominate over any individual issues.  Each class member's claim is controlled by Maryland's wage and hour statutory scheme and one set of facts.  This is based on Defendant's failure to pay overtime as required by MWHL and its subsequent failure to pay all wages due at the end of an individual's employment as required by the MWPCL.  Similarly, the damages are eminently certifiable in that Defendant's records will provide the amount and frequency each class member was paid as well as the amount of time each class member worked.

110.    This action is maintainable as a class action.  The prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications with respect to individual members of the classes. This would establish incompatible standards of conduct for Defendant.  If they were to pursue their claims separately, the numerous adjudications that would be required to protect the individual interests of the class members would constitute a considerable drain and burden on judicial resources.

111.    Accordingly, the Court should certify the proposed classes.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

**Count I –** *Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiffs, all Members of the Collective Class and All Those Appropriately Joined to This Matter*

112.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

113.    Plaintiffs are entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

114.    As described above, Plaintiffs have not received from Defendant compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

115.    Defendant willfully and intentionally failed to compensate Plaintiffs properly for the overtime wages they are owed.

116.    There is no bona fide dispute that Plaintiffs are owed overtime wages for work performed for Defendant.

117.    All members of the putative Collective are similarly situated to Plaintiffs and have suffered the same and/or similar harm resulting from the same policies and practices complained of in this Complaint.

118.    Under the FLSA, Plaintiffs and all members of the Collective are entitled to additional wages from Defendant to compensate them for hours worked in a workweek in excess of forty (40) at a rate of one and a half (1.5) times Plaintiffs' and each member of the Collective's regular hourly wage rate.

**Count II – *Violation of MWHL: Failure to Pay Overtime Wages to Plaintiffs, All Members of the MWHL Class and All Those Appropriately Joined to This Matter***

119.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

120.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

121.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-420(a), an employer shall compute the wage for overtime under Md. Code Ann., Lab. & Empl. § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

122.    Plaintiffs have not received compensation from Defendant reflecting the prescribed overtime wage rate for all hours worked in excess of forty (40) in a week.

123.    Defendant willfully and intentionally did not compensate Plaintiffs for the overtime wages they are owed.

124.    There is no bona fide dispute that Plaintiffs are owed overtime wages for work performed for Defendant.

125.    All members of the putative MWHL Class are similarly situated to Plaintiffs and have suffered the same and/or similar harm resulting from the same policies and practices complained of in this Complaint.

126.    Under MWHL, Plaintiffs and all members of the MWHL Class are entitled to additional wages from Defendant to compensate them for hours worked in a workweek in excess of forty (40) at a rate of one and a half (1.5) times Plaintiffs' and each member of the MWHL Class' regular hourly wage rate.

**Count III – *Violation of the MWPCL: Failure to Pay Plaintiffs, All Members of the MWPCL Class their Wages Owed at the Termination of their Employment and All Those Appropriately Joined to This Matter***

127.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

128.    Plaintiffs are entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501 et seq., which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.

129.    In accordance with §3-505(a), Plaintiffs have not received compensation from Defendant for all wages owed for work performed before the termination of their employment. This is specific to Defendant's failure to pay Plaintiffs the overtime wages they are entitled to. Similarly, Defendant failed to pay the members of the MWPCL Class correctly. They were paid in the same manner as Plaintiffs.

130.    Defendant willfully and intentionally did not compensate Plaintiffs or the members of the MWPCL Class with the wages owed to them and continued to violate the MWPCL, even after Plaintiffs informed Defendant of the violation.

131.    All members of the MWPCL Class are similarly situated to Plaintiffs and have suffered the same harm resulting from the same policies and practices complained of in this Complaint.

132.    Under the MWPCL, there is no bona fide dispute that Plaintiffs and the MWPCL Class are owed wages for work performed while employed by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and others similarly situated, pray for

the following relief:

a)   In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiffs and those similarly situated;

b)   In accordance with Rule 23 of the Federal Rules of Civil Procedure, designation of this action as a class action on behalf of Plaintiffs and members of the classes certified by motion during the course of this litigation;

c)   Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses and emails of all those individuals who are similarly situated and permitting Plaintiffs to send notice of this action to all those similarly situated individuals;

d)   Designating the named Plaintiffs to act as class representatives on behalf of all similarly situated employees for the FLSA collective class;

e)   Designating the named Plaintiffs to act as class representatives on behalf of all members of the Maryland state law classes certified during the course of this litigation;

f)   Judgment against Defendant for its failure to pay Plaintiffs, those appropriately joined to this matter and those similarly situated in accordance with the standards set forth by the FLSA;

g)   Judgment against Defendant for its failure to pay Plaintiffs, those appropriately joined to this matter and members of the MWHL Class in accordance with the standards set forth by MWHL;

h)   Judgment against Defendant for its failure to pay Plaintiffs, those appropriately joined to this matter and all members of the MWPCL class in accordance with the standards set forth by the MWPCL;

i)   Judgment against Defendant and classifying its conduct as willful and not in good faith;

j)   Judgment against Defendant and classifying Plaintiffs, the collective class, those appropriately joined in this matter and members of all classes certified as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

k)   An award against Defendant for the amount of unpaid overtime wages owed to Plaintiffs, those similarly situated and members of all classes certified, calculated at

a rate that is not less than one and a half (1.5) times Plaintiffs', all other similarly situated employees' and members of all certified classes' regular hourly rate for all overtime hours worked;

l)    An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiffs, those similarly situated and members of all classes certified during the course of this litigation, whichever is deemed just and equitable by this Honorable Court;

m)   An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendant;

n)    Leave to add additional plaintiffs to all claims by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

o)    All further relief deemed just and equitable by this Honorable Court.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request that a jury of their peers hear and decide all possible claims brought on behalf of Plaintiffs and those similarly situated.

Respectfully submitted,

/s/ Robert J. Leonard
Robert J. Leonard, Esq. (07183)
rleonard@nicholllaw.com
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-8454

*Attorneys for Plaintiffs*