# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (NORTHERN DIVISION)

| | |
|---|---|
| **IAN CHADO**<br>414 Poole Road, Unit B1<br>Westminster, Maryland 21157<br>*Resident of Carroll County* | Collective/Class Action Claim |
| **NANCY NGUYEN**<br>6721 Quiet Hours<br>Columbia, Maryland 21045<br>*Resident of Harford County* | |
| **WILLIAM RUSH**<br>400 Symphony Circle<br>Hunt Valley, Maryland 21030<br>*Resident of Baltimore County* | <u>Jury Trial Requested</u> |
| **ANDREW STERNE**<br>18021 Lafayette Drive<br>Olney, Maryland 20832<br>*Resident of Montgomery County* | |
| **ATCHESON CONWAY**<br>4304 Valley View Avenue<br>Baltimore, Maryland 21206<br>*Resident of Baltimore City* | Civil Action No.: 1:17-cv-02945-JKB |
| **CHRISTINA LAMBROS**<br>303 Tall Pines Court<br>Apartment L<br>Abingdon, Maryland 21009<br>*Resident of Harford County* | |
| **ELIZABETH KARPOFF**<br>1267 Birch Avenue<br>Arbutus, Maryland 21227<br>*Resident of Baltimore County* | |
| **EMILY WITMER**<br>2934 North George Street<br>York, Pennsylvania 17406<br>*Resident of York County* | |
| **IAN CLARK**<br>203 North Shamrock Road | |


PLAINTIFF'S
EXHIBIT
14

Bel Air, Maryland 21014
*Resident of Harford County*

**IRA LEWIS**
12822 Glynis Road
Clinton, Maryland 20735
*Resident of Prince George's County*

**JAMES COLLINS**
P.O. Box 20544
Baltimore, Maryland 21223
*Resident of Baltimore City*

**JAMES HUNTER, JR**.
3935 Bush Court
Abingdon, Maryland 21009
*Resident of Harford County*

**JESSICA WELCH**
2802 Red Rose Court
Abingdon, Maryland 21009
*Resident of Harford County*

**JOSEPH FERRIS**
3009 90th Place SE
Mercer Island. Washington 98040
*Resident of King County*

**JULIUS FRANKS**
1521 Shadyside Road
Baltimore, Maryland 21218
*Resident of Baltimore City*

**JUSTIN GAYLES**
932 West Lombard Street
Baltimore, Maryland 21223
*Resident of Baltimore City*

**KAREN BOWERS**
3624 Fairview Avenue
Baltimore, Maryland 21216
*Resident of Baltimore City*

**KENISHA HILL**
3520 Leslie Way
Apartment 204
Laurel, Maryland 20724

*Resident of Anne Arundel County*

**LANCE HINTON**
918 Academy Drive
Owings Mills, Maryland 21117
*Resident of Baltimore County*

**LESLIE WILLIAMS**
10849 Old Woods Way
Columbia, Maryland 21044
*Resident of Howard County*

**MARCELLUS BROTHERS**
201 Milford Mill Road
Suite 202
Pikesville, Maryland 21208
*Resident of Baltimore County*

**MARK ROBERTS**
6609 Frederick Road
Catonsville, Maryland 21228
*Resident of Baltimore County*

**MARLA HESS**
14203 Quail Creek Way
Sparks, Maryland 21152
*Resident of Baltimore County*

**MICHAEL SULLIVAN, JR.**
4900 Dromoland Court
Apartment C
Owings Mills, Maryland 21117
*Resident of Baltimore County*

**NICHOLAS MILLER**
14 Hallview Court
Nottingham, Maryland 21236
*Resident of Baltimore County*

**PHILO GENTLES**
913 Southerly Road
Apartment 380
Towson, Maryland 21204
*Resident of Baltimore County*

**RODNEY BONDS**
9034 Old Harford Road

Baltimore, Maryland 21234
*Resident of Baltimore City*

**RODGER SHEA**
708 Sequoia Drive
Edgewood, Maryland 21040
*Resident of Harford County*

**ROOSEVELT LUNN**
8420 Merryview Drive
Windsor Mill, Maryland 21244
*Resident of Harford County*

**SHANITA STARKS**
305 West Monument Street
Apartment 103
Baltimore, Maryland 21201
*Resident of Baltimore City*

**SHEILA JONES-WILLIAMS**
1351 Dartmouth Avenue
Baltimore, Maryland 21234
*Resident of Baltimore City*

**STEPHEN YOUNG**
29 Independence Drive
New Freedom, Pennsylvania 17349
*Resident of York County*

**STEVEN DAVIDS**
2301 Warfield Drive
Forest Hill, Maryland 21050
*Resident of Harford County*

**STEVEN KINNEY**
3317 Penfold Driver
Gwynn Oak, Maryland 21207
*Resident of Baltimore County*

**STOCKTON WORDEN, III**
639 Chapel Hill Road
Spring Lake, NC 28390
*Resident of Cumberland County*

**TAMMY HALL**
10902 Huntcliff Drive
Apartment 9

Owings Mills, Maryland 21117
*Resident of Baltimore County*

**TERESA JENKINS**
1403 Jarvis Avenue
Oxon Hill, Maryland 20745
*Resident of Prince George's County*

and

**WILLIAM FRANKLIN**
2351 Sundew Terrace
Baltimore, Maryland 21209
*Resident of Baltimore City*

    Plaintiffs,

***Individually and on Behalf of All
Similarly Situated Employees***

v.

**NATIONAL AUTO INSPECTIONS, LLC
T/A CARCHEX**
10950 Gilroy Road, Suite D
Hunt Valley, Maryland 21031

Serve: Jason Goldsmith, R.A.
   10950 Gilroy Road, Suite D
   Hunt Valley, Maryland 21031

**CARCHEX, LLC**
118 Shawan Road
Suite 210
Baltimore, Maryland 21030

Serve: Cogency Global Inc.
   1519 York Road
   Lutherville, Maryland 21093

and

**JASON GOLDSMITH**
1910 Corbridge Lane
Monkton, Maryland 21111
*Resident of Baltimore County*

5

Serve: Jason Goldsmith
      1910 Corbridge Lane
      Monkton, Maryland 21111

      Defendants.

## AMENDED COLLECTIVE AND CLASS COMPLAINT FOR WAGES OWED

IAN CHADO, NANCY NGUYEN and WILLIAM RUSH, ANDREW STERNE, ATCHESON CONWAY, CHRISTINA LAMBROS, ELIZABETH KARPOFF, EMILY WITMER, IAN CLARK, IRA LEWIS, JAMES COLLINS, JAMES HUNTER, JR., JESSICA WELCH, JOSEPH FERRIS, JULIUS FRANKS, JUSTIN GAYLES, KAREN BOWERS, KENISHA HILL, LANCE HINTON, LESLIE WILLIAMS, MARCELLUS BROTHERS, MARK ROBERTS, MARLA HESS, MICHAEL SULLIVAN, JR., NICHOLAS MILLER, PHILO GENTLES, ROBERT WOODS, RODGER SHEA, RODNEY BONDS, ROOSEVELT LUNN, SHANITA STARKS, SHEILA JONES-WILLIAMS, STEPHEN YOUNG, STEVEN DAVIDS, STEVEN KINNEY, STOCKTON WORDEN, III, TAMMY HALL, TERESA JENKINS and WILLIAM FRANKLIN, Plaintiffs, by and through their undersigned counsel and The Law Offices of Peter T. Nicholl, on behalf of themselves and all others similarly situated, hereby submit their Amended Complaint against NATIONAL AUTO INSPECTIONS, LLC T/A CARCHEX, CARCHEX, LLC and JASON GOLDSMITH, individually, Defendants, to recover unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter, "FLSA"); unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.* (hereinafter, "MWHL"); and unpaid wages, treble damages, interest, reasonable attorneys' fees and costs under the Maryland

Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq.* (hereinafter, "MWPCL"), and in support thereof, state as follows:

## INTRODUCTION AND BACKGROUND

Defendants National Auto Inspections, LLC, t/a CARCHEX, (hereinafter, "CARCHEX" or "Defendant"), CARCHEX, LLC (hereinafter, "CARCHEX LLC" or "Defendant") and JASON GOLDSMITH (hereinafter, "Goldsmith" or "Defendant") are in the business of selling vehicle related insurance products. Defendants' primary product consists of Extended Vehicle Protection Plans (hereinafter, "EVPP"). EVPPs are warranties that replace a vehicle's manufacturer's warranty once it has expired. Defendants also offers roadside assistance plans, pre-purchase vehicle inspections and assistance with comparing insurance premiums. Defendants partners with numerous companies, including, but not limited to, CARFAX, Allstate and Edmunds.

To sell its products, Defendants own and operate a call center. Defendants employ EVPP Specialists, also known as Vehicle Protection Specialists (hereinafter, "VPS"), collectively referred to as "Specialists," at its call center. Plaintiffs and others similarly situated were employed as Specialists. Plaintiffs and other Specialists were responsible for selling EVPPs, Defendants' primary product. Specialists made and received calls to and from Defendants' prospective customers. Outbound calls were generated from leads given to Specialists. Leads originated from several sources, including a prospective customer's online request for information through Defendants' website, direct mail to prospective customers and referrals from Defendants' partners.

Specialists were paid via a piece-rate payment structure, which included bonus incentives and a minimum guarantee. This structure was primarily based on the number of EVPPs or "units" that a Specialist sold. Specialists received a set amount per EVPP sold, regardless of the actual value of the EVPP. The amount solely depended on the type of EVPP sold.

Specialists were also entitled to bonuses for meeting certain goals. This included bonuses related to financing options, surcharges and gross profit shares. There were also bonuses based on the number of monthly and cumulative EVPPs sold. Defendants also offered bonuses to its top sellers.

Based on these incentives, Defendants fostered an environment that promoted long hours. To increase their sales, Defendants encouraged Plaintiffs and other Specialists to work through lunch, to work on the weekends and to work from home. It was common for Plaintiffs and other Specialists to work excessive hours. This was the only way they could attempt to meet Defendants' rigid sales goals. Working these long hours also served the dual purpose of avoiding any disciplinary action that resulted from not meeting their goals. These circumstances resulted in numerous weeks where Plaintiffs and other Specialists worked well over forty (40) hours. However, Defendants failed to offer any additional compensation to account for the overtime its Specialists worked.

Because Plaintiffs and other Specialists were paid on a piece rate basis, they were entitled to overtime compensation. Plaintiffs' and other Specialists' bonuses should have been added to their piece rate compensation for purposes of calculating their regular hourly rates. Plaintiffs and other Specialists were entitled to overtime pay based on those rates. The fact that Plaintiffs and other Specialists received a minimum guarantee during certain weeks did not change their entitlement to overtime.

Defendants were well aware of the overtime hours its Specialists worked. Plaintiffs and other Specialists did not perform any duties that would exempt them from the overtime requirements of the FLSA or MWHL. The nature of Defendants' business also did not qualify it for any exemptions contained therein. Therefore, Plaintiffs and other Specialists were entitled to overtime pay. By not providing its Specialists with such pay, Defendants willfully evaded the

payment of wages owed to Plaintiffs and others similarly situated. This conflicts with the standards set forth by the FLSA, MWHL and the MWPCL. Defendants are currently engaged in this unlawful activity. This mandated the filing of this Complaint.

## THE PARTIES

1.      Plaintiff Ian Chado (hereinafter, "Chado") is an adult resident of Carroll County, Maryland.

2.      Plaintiff Nancy Nguyen (hereinafter, "Nguyen") is an adult resident of Harford County, Maryland.

3.      Plaintiff William Rush (hereinafter, "Rush") is an adult resident of Baltimore County, Maryland.

4.      Plaintiff Andrew Sterne (hereinafter, "Sterne") is an adult resident of Montgomery County, Maryland.

5.      Plaintiff Atcheson Conway (hereinafter, "Conway") is an adult resident of Baltimore City, Maryland.

6.      Plaintiff Christina Lambros (hereinafter, "Lambros") is an adult resident of Harford County, Maryland.

7.      Plaintiff Elizabeth Karpoff (hereinafter, "Karpoff") is an adult resident of Baltimore County, Maryland.

8.      Plaintiff Emily Witmer (hereinafter, "Witmer") is an adult resident of York County, Pennsylvania.

9.      Plaintiff Ian Clark (hereinafter, "Clark") is an adult resident of Prince George's County, Maryland.

10.      Plaintiff Ira Lewis (hereinafter, "Lewis") is an adult resident of Baltimore County, Maryland.

11.     Plaintiff James Collins (hereinafter, "Collins") is an adult resident of Baltimore City, Maryland.

12.     Plaintiff James Hunter, Jr. (hereinafter, "Hunter") is an adult resident of Harford County, Maryland.

13.     Plaintiff Jessica Welch (hereinafter, "Welch") is an adult resident of Harford County, Maryland.

14.     Plaintiff Joseph Ferris (hereinafter, "Ferris") is an adult resident of King County, Washington.

15.     Plaintiff Julius Franks (hereinafter, "Franks") is an adult resident of Baltimore City, Maryland.

16.     Plaintiff Justin Gayles (hereinafter, "Gayles") is an adult resident of Baltimore City, Maryland.

17.     Plaintiff Karen Bowers (hereinafter, "Bowers") is an adult resident of Baltimore City, Maryland.

18.     Plaintiff Kenisha Hill (hereinafter, "Hill") is an adult resident of Anne Arundel County, Maryland.

19.     Plaintiff Lance Hinton (hereinafter, "Hinton") is an adult resident of Baltimore County, Maryland.

20.     Plaintiff Leslie Williams (hereinafter, "Williams") is an adult resident of Howard County, Maryland.

21.     Plaintiff Marcellus Brothers (hereinafter, "Brothers") is an adult resident of Baltimore County, Maryland.

22.     Plaintiff Mark Roberts (hereinafter, "Roberts") is an adult resident of Baltimore County, Maryland.

23. Plaintiff Marla Hess (hereinafter, "Hess") is an adult resident of Baltimore County, Maryland.

24. Plaintiff Michael Sullivan, Jr. (hereinafter, "Sullivan") is an adult resident of Baltimore County, Maryland.

25. Plaintiff Nicholas Miller (hereinafter, "Miller") is an adult resident of Baltimore County, Maryland.

26. Plaintiff Philo Gentles (hereinafter, "Gentles") is an adult resident of Baltimore County, Maryland.

27. Plaintiff Rodney Bonds (hereinafter, "Bonds") is an adult resident of Baltimore City, Maryland.

28. Plaintiff Rodger Shea (hereinafter, "Shea") is an adult resident of Harford County, Maryland.

29. Plaintiff Roosevelt Lunn (hereinafter, "Lunn") is an adult resident of Harford County, Maryland.

30. Plaintiff Shanita Starks (hereinafter, "Starks") is an adult resident of Baltimore City, Maryland.

31. Plaintiff Sheila Jones-Williams (hereinafter, "Jones-Williams") is an adult resident of Baltimore City, Maryland.

32. Plaintiff Stephen Young (hereinafter, "Young") is an adult resident of York County, Pennsylvania.

33. Plaintiff Steven Davids (hereinafter, "Davids") is an adult resident of Harford County, Maryland.

34. Plaintiff Steven Kinney (hereinafter, "Kinney") is an adult resident of Baltimore County, Maryland.

35.     Plaintiff Stockton Worden, III (hereinafter, "Worden") is an adult resident of Cumberland County, North Carolina.

36.     Plaintiff Tammy Hall (hereinafter, "Hall") is an adult resident of Baltimore County, Maryland.

37.     Plaintiff Teresa Jenkins (hereinafter, "Jenkins") is an adult resident of Prince George's County, Maryland.

38.     Plaintiff William Franklin (hereinafter, "Franklin") is an adult resident of Baltimore City, Maryland.

39.     Defendant National Auto Inspections, LLC, t/a CARCHEX, (hereinafter, "Defendant" and/or "CARCHEX") was an incorporated for-profit business. [1]

40.     Defendant CARCHEX, LLC, (hereinafter, "Defendant" and/or "CARCHEX, LLC") is an incorporated for-profit business.

41.     At all times relevant to this Complaint, Defendant Jason Goldsmith (hereinafter, "Goldsmith"), owned and operated CARCHEX, and all CARCHEX related entities.

42.     Defendants' principle office is in Hunt Valley, Maryland.

43.     Defendants are engaged in the sale of vehicle-related insurance products.

44.     Defendants sell Extended Vehicle Protection ("EVPP") plans, roadside assistance plans, as well as pre-purchase inspections. With the help of its partners, Defendants also assist their customers with acquiring car insurance.

---

[1] Any reference to Defendants shall include its corporate officers and all those empowered to act as agents of the corporation, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency. To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendants."

45.     To sell its products and those of its partners, Defendants own and operate a call center.

46.     Defendants conduct business throughout various regions across the United States.

47.     Due to the nature of their business, Defendants are subject to the FLSA, MWHL and the MWPCL.[2]

48.     Defendants are subject to the FLSA, MWHL and the MWPCL due to the amount in revenues generated. Defendants' annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

49.     At all times relevant to this Complaint, Plaintiffs engaged in interstate commerce. This was based on the nature of the duties they performed as part of their employment with Defendants. Throughout their employment, Plaintiffs communicated with consumers in various states for purposes of making sales.

50.     At all times throughout their employment, Plaintiffs worked for Defendants, who fell within the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

51.     Plaintiffs and others similarly situated worked as non-exempt employees for Defendants. The duties assigned to Plaintiffs and all others similarly situated did not satisfy the duties tests contained within the exemptions specified in the FLSA, MWHL or the MWPCL.

52.     From August 21, 2015 to July 3, 2017, Plaintiff Chado was employed by Defendants as an EVPP Specialist, also known as a Vehicle Protection Specialist ("VPS") (collectively referred to as "Specialist").

---

[2] Defendants do not qualify as a retail or service establishment. Less than seventy-five percent (75%) of its business consists of the sale of goods or services that have been produced in interstate commerce.

53. From approximately December 2015 to June 2016, Plaintiff Nguyen was employed by Defendants as a Specialist.

54. From approximately March 2013 to June 2016, Plaintiff Rush was employed by Defendants as a Specialist.

55. From approximately May 2017 to July 2017, Plaintiff Sterne was employed by Defendant as a Specialist.

56. From approximately January 2017 to April 2017, Plaintiff Conway was employed by Defendant as a Specialist.

57. From approximately July 2014 to May 2016, Plaintiff Lambros was employed by Defendant as a Specialist.

58. From approximately January 2017 to April 2017, Plaintiff Karpoff was employed by Defendant as a Specialist.

59. From approximately May 2015 to February 2016, Plaintiff Witmer was employed by Defendant as a Specialist.

60. From approximately March 2016 to September 2016, Plaintiff Clark was employed by Defendant as a Specialist.

61. From approximately 2016 to 2017, Plaintiff Lewis was employed by Defendant as a Specialist.

62. From approximately September 2017 to January 2018, Plaintiff Collins was employed by Defendant as a Specialist.

63. From approximately January 2017 to November 2017, Plaintiff Hunter was employed by Defendant as a Specialist.

64. From approximately September 2015 to June 2016, Plaintiff Welch was employed by Defendant as a Specialist.

65. From approximately November 2015 to September 2016, Plaintiff Ferris was employed by Defendant as a Specialist.

66. From approximately August 2017 to February 2018 Franks was employed by Defendant as a Specialist.

67. From approximately May 2015 to October 2017, Plaintiff Gayles was employed by Defendant as a Specialist.

68. From approximately December 2016 to June 2017, Plaintiff Bowers was employed by Defendant as a Specialist.

69. From approximately October 2016 to November 2017, Plaintiff Hill was employed by Defendant as a Specialist.

70. From approximately August 2016 to February 2017, Plaintiff Hinton was employed by Defendant as a Specialist.

71. From approximately March 2014 to January 2017, Plaintiff Williams was employed by Defendant as a Specialist.

72. From approximately October 2014 to June 2017, Plaintiff Brothers was employed by Defendant as a Specialist.

73. From approximately February 2014 to June 2016, Plaintiff Roberts was employed by Defendant as a Specialist.

74. From approximately 2015 to 2016, Plaintiff Hess was employed by Defendant as a Specialist.

75. From approximately February 2015 to June 2016, Plaintiff Sullivan was employed by Defendant as a Specialist.

76. From approximately November 2015 to September 2017, Plaintiff Miller was employed by Defendant as a Specialist.

77.     From approximately December 2014 to October 2017, Plaintiff Gentles was employed by Defendant as a Specialist.

78.     From approximately April 2015 to October 2015, Plaintiff Woods was employed by Defendant as a Specialist.

79.     From approximately June 2015 to January 2016, Plaintiff Shea was employed by Defendant as a Specialist.

80.     From approximately April 2014 to October 2016, Plaintiff Bonds was employed by Defendant as a Specialist.

81.     From approximately August 2014 to June 2016, Plaintiff Lunn was employed by Defendant as a Specialist.

82.     From approximately July 2016 to January 2018, Plaintiff Starks was employed by Defendant as a Specialist.

83.     From approximately December 2014 to February 2015, Plaintiff Jones-Williams was employed by Defendant as a Specialist.

84.     From approximately July 2016 to December 2016, Plaintiff Young was employed by Defendant as a Specialist.

85.     From approximately September 2016 to March 2017, Plaintiff Davids was employed by Defendant as a Specialist.

86.     From approximately January 2015 to January 2016, Plaintiff Kinney was employed by Defendant as a Specialist.

87.     From approximately October 2014 to February 2015, Plaintiff Worden was employed by Defendant as a Specialist.

88.     From approximately July 2016 to January 2018, Plaintiff Hall was employed by Defendant as a Specialist.

89. From approximately October 2016 to January 2017, Plaintiff Jenkins was employed by Defendant as a Specialist.

90. From approximately November 2016 to February 2017, Plaintiff Franklin was employed by Defendant as a Specialist.

91. Defendants controlled the administration of its business and set employee schedules, including those of Plaintiffs and other Specialists.

92. Defendants' agents were, individually and together, actively engaged in the management and direction of Plaintiffs and other similarly situated employees.

93. Defendants possessed and exercised authority to determine the hours worked by Plaintiffs and other Specialists.

94. Defendants had the authority to control Plaintiffs' tasks and the tasks of others similarly situated.

95. Defendants had and exercised the power and authority to change the course of Plaintiffs' and other similarly situated employees' duties.

96. Plaintiffs and members of the putative classes recognized Defendants' authority and obeyed Defendants' instructions.

97. Defendants made all decisions relating to Plaintiffs' and other similarly situated employees' rates and methods of pay.

## JURISDICTION AND VENUE

98. Original jurisdiction in this Honorable Court is expressly provided by FLSA, 29 U.S.C. § 207, *et seq*. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

99.     Discretionary supplemental jurisdiction of Plaintiffs' Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiffs' federal claims are based.

100.    Furthermore, no reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

101.    Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.

102.    This Honorable Court has personal jurisdiction over Defendants; Defendant CARCHEX, LLC is a limited liability company organized under the laws of Maryland and Defendant CARCHEX, LLC conducts sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

103.    Defendants are in the business of selling various automobile related insurance products. Defendants' primary product consists of Extended Vehicle Protection Plans (hereinafter, "EVPPs"). EVPPs are warranties that replace the manufacturer warranty on a vehicle once that warranty has expired.

104.    Plaintiffs and similarly situated employees were hired to work as EVPP Specialists, also known as Vehicle Protection Specialists ("VPS") (collectively referred to as, "Specialists"). They all worked out of Defendants' call center in Hunt Valley, Maryland.

105.    Specialists were all charged with selling the products offered by Defendants and its partners. This was accomplished through making and receiving calls to and from Defendants'

prospective customers. Outbound calls were generated from leads from various sources. These sources include direct mail, referrals from Defendants' partners and a potential customer's request for information through Defendants' website.

106.    During the course of a sale, Plaintiffs and other Specialists were required to take down and enter a prospective customer's information. They were also required to read from scripts developed by Defendants.

107.    Defendants required Plaintiffs and other Specialists to follow the terms of each script precisely. Failure to do so would result in penalties.[3]

108.    Plaintiffs and other Specialists did not have any discretion. They lacked independent judgement. They were required to follow all of Defendants' instructions. They had no authority to act on their own.

109.    While performing their daily tasks, Plaintiffs and other similarly situated employees did not require any specialized training or advanced knowledge.

110.    Plaintiffs and others similarly situated did not perform any analysis.

111.    Plaintiffs and other Specialists did not interpret any information.

112.    Plaintiffs and others Specialists did not write any reports.

113.    Plaintiffs and other Specialists performed their duties to the extent required by Defendants.

114.    Plaintiffs and other Specialists satisfied the requirements of their job and adequately performed their duties to benefit Defendants, as well as the Defendants' customers.

---

[3] For instance, if Plaintiffs or other Specialists failed to read from Defendants' "closing script," they suffered a twenty-five-dollar ($25.00) deduction from their pay for each call where they failed to do so.

115. Defendants paid its Specialists via a complex piece-rate structure. Included with this structure were bonus incentives and a minimum guarantee.

116. Defendants' payment structure was primarily based on the number of EVPPs, or "units," that its Specialists sold. Specialists received a set amount for each EVPP sold, regardless of the actual value of the EVPP. The amount paid to Plaintiffs and other Specialists depended solely on the type of EVPP sold.

117. Defendants offered five (5) levels of EVPPs: Titanium, Platinum, Gold, Silver and Bronze. For Titanium, Platinum and Gold EVPPs, Plaintiffs and other Specialists received one hundred ($100.00) to one hundred and twenty-five dollars ($125.00) for each unit sold. They received seventy-five ($75.00) to one hundred dollars ($100.00) for each Silver and fifty-five dollars ($55.00) for each Bronze EVPP sold.

118. For certain categories of EVPPs, Plaintiffs and other Specialists received seventy-five dollars ($75.00) for each unit sold, regardless of the level.

119. If the EVPP was attributable to a ridesharing vehicle, Plaintiffs and other Specialists received fifty dollars ($50.00) per unit.

120. Defendants also offered various bonuses for meeting pre-determined sales goals. These bonuses included additions for financing options and surcharges. There was also a Monthly Units Sold and a Cumulative Units Sold bonus. Defendants also offered a Top 5 Vehicle Protection Specialist and a Gross Profit Share bonus.

121. Bonuses based on financing options primarily depended on whether the EVPP was paid in full. Bonuses based on additions for surcharges were dependent upon several factors. This included whether the EVPP was for a commercial or "high tech" vehicle, whether it covered a navigation system, the type of emissions of the covered vehicle and whether the EVPP included

20

Key Guard protection (replacement value for stolen, damaged, or lost keys). Each option that Plaintiffs and other Specialists sold to customers was added to their bonus.

122.   Defendants' "Monthly Units Sold" bonus was based on the number of EVPPs sold per month. The bonus payout was split into two (2) halves each month. The first half was measured against half of the monthly goals set by Defendants. If these goals were met, Plaintiff and other Specialists would receive a bonus for this period. This bonus was subsequently deducted from their final monthly bonus, which was distributed on the fifteenth of the following month. This bonus was calculated based on the total number of EVPPs sold during the entire month.

123.   The "Cumulative Retention" bonus was based on the total number of EVPPs that Plaintiffs and other Specialists sold throughout their employment. They would receive a one (1) time bonus of one thousand dollars ($1,000.00) for the first hundred (100) units sold. They received five hundred dollars ($500.00) for every subsequent batch of one hundred (100) EVPPs sold.[4]

124.   The "Top 5 Protection Specialist" bonus was based on performance. Each month, the five (5) Specialists who sold the most would split a proportional amount determined by Defendants. Pursuant to the goal set for each month, Defendants would typically put in two dollars ($2.00) per EVPP sold. Once that goal was exceeded, Defendants would put in five dollars ($5.00) for every additional EVPP sold.

125.   Plaintiffs and other Specialists were entitled to a "Gross Profit Sharing" bonus only if they met the minimum monthly goal of selling thirty-five (35) EVPPs for three (3) months straight. Once this goal was met, they would receive a percentage based on the value of each EVPP sold that month. They typically received one point two-five percent (1.25%) for selling

---

[4] On September 1, 2016, Defendants increased its Cumulative Retention bonus. Plaintiffs and other Specialists started to receive six hundred dollars ($600.00) for every additional one hundred (100) units sold.

thirty-five (35) or more EVPPs. The percentage of their total volume of sales for the month that Plaintiffs and other Specialists received increased depending on how many EVPPs they sold. For instance, they would receive five percent (5%) of their monthly sales volume for selling eighty (80) or more EVPPs.

126.    Plaintiffs and other Specialists would lose the Gross Profit Sharing bonus if they failed to meet the minimum monthly threshold of selling thirty-five (35) EVPPs for a period of two (2) consecutive months. Specialists would also be charged back a portion of their paid bonus(es) if they did not meet their monthly requirements.

127.    All of these bonuses were subject to various deductions. This included deductions for cancellations made by customers within the first ninety (90) days of the policy. Deductions were also based on price matches and manager discounts, as well as for customers who participated in certain programs.  There were also deductions specific to violations of company sales policies. This included failing to read the closing script, submitting incorrect mileage reports and deductions relating to expenses incurred by a customer as a result of a Specialist's error.

128.    In addition to the bonuses described above, Defendants also paid Plaintiffs and other Specialists a "Guaranteed Minimum Commission" when their earned piece-rate and bonus payments that did not rise above a certain threshold.  The amount of the Guaranteed Minimum Commission was set by Defendants. It would change each month during the first four (4) months of a Specialist's employment, after which it remained constant.  The guarantee was paid on a bi-monthly basis.  Each bi-monthly period, it had to be determined whether a Specialist was to be paid half of the Guaranteed Minimum Commission or the actual payment they earned.  The Specialist would receive the greater of the two (2).

129.    For the duration of their employment, Plaintiffs and all other Specialists were paid pursuant to the plan described above. This plan did not provide for any additional compensation during weeks where they worked over forty (40) hours.

130.    Plaintiffs and other Specialists consistently worked over forty (40) hours each week. Working overtime was integral to their employment.

131.    Plaintiffs were scheduled to work a minimum of forty-five (45) hours per week. This was based on working five (5) nine (9) hour shifts Monday through Friday. Each shift was to include a one (1) hour break for lunch, however Plaintiffs and other Specialists routinely worked through lunch to cover Defendants' phones as well as increase their sales numbers.

132.    Plaintiffs and other Specialists were also scheduled to work on the weekends. They all had to work at least one (1) Saturday every three (3) weeks, which was a five (5) to nine (9) hour shift.

133.    During weeks when Plaintiffs and other Specialists were scheduled to work on Saturdays, they had to work a minimum of fifty (50) to fifty-four (54) hours per week. Therefore, Plaintiffs and other Specialists consistently worked between forty-five (45) and fifty-four (54) hours each week as a result of their regular schedules.

134.    Plaintiffs and other Specialists were scheduled to work five (5) nine (9) hour shifts Monday through Friday. The start time for each shift was dependent upon Defendants' needs. Some Specialists would begin their shifts at 8:00 a.m. Others would begin at 9:00 a.m. or 10:00 a.m. Some would begin even later. This resulted in Plaintiffs and other Specialists working staggered shifts.

135.    Due to working staggered shifts, the time that Plaintiffs' and other Specialists' shifts ended varied. Depending on the time they actually arrived to work, Plaintiffs and other

Specialists would typically leave work between 5:00 p.m. to 8:00 p.m. Due to the demands of their employment, there were times when they left even later.

136.    Any time that the calendar days within a month ended on a Saturday or Sunday, Plaintiffs and other Specialists were all required to work that Saturday. They were required to work this extra Saturday in addition to the Saturdays that were already a part of their rotating schedules.[5] These weekend shifts caused Plaintiffs and other Specialists to consistently work far beyond forty (40) hours each week.

137.    There were other factors that caused Plaintiffs and other Specialists to work overtime regularly. Defendants fostered a competitive atmosphere amongst its Specialists. Defendants pushed its Specialists to increase their production by any means necessary. This was accomplished through its pay structure, which focused primarily on production. The various bonuses Defendants offered its Specialists were based on high productivity.

138.    Defendants encouraged its Specialists to put in extra hours in order to produce more and more. Defendants stressed the importance of striving to go far beyond simply meeting minimum sales goals in order to earn extra money. Defendants' bonus structure was developed in order to encourage its employees to work long hours.

139.    The financial incentives prompted many Specialists to work extended hours. They would routinely report to work prior to when their shifts were scheduled to begin. They would regularly leave work after the time their shifts were scheduled to end.

---

[5] During the week, although Defendants occasionally allowed Plaintiffs and other Specialists to come in two (2) hours late each day to make up for the mandatory Saturday shift, Plaintiffs and other Specialists seldom, if ever, took advantage of this opportunity. This resulted from both the threats and incentives employed by Defendants to encourage its Specialists to increase their production. For Saturdays that fell at the end of the month, this scheduling opportunity was not offered to Specialists.

140.    It was also common for Plaintiffs and other Specialists to work on their days off. Some Specialists worked every Saturday in an attempt to increase their sales numbers. Many worked more Saturdays than their schedules required in hopes of earning bonuses. The same caused Plaintiffs and other Specialists to come in early and stay late.

141.    Plaintiffs and other Specialists also routinely worked through their scheduled lunches. They rarely took their one (1) hour break. This too was for purposes of increasing their production. The potential to earn bonuses led Plaintiff and other Specialists to non-stop.

142.    Bonus potential also caused Plaintiffs and other Specialists to work from home. They consistently worked from home both before and after their scheduled shifts, in addition to days they were scheduled to be off. Although Defendants' hours of operation were from 9:00 a.m. to 9:00 p.m. Monday through Friday, the time Plaintiffs and other Specialists were required to accept incoming calls, Defendants did not need to be open for business in order for its Specialists to be working. This was because their duties did not solely consist of accepting inbound calls; Plaintiffs' and other Specialists' primary duty was to make outbound calls, which did not require Defendants' business to be open.

143.    To perform their duties, all that Plaintiffs and other Specialists needed was a working phone, a computer and an internet connection. Specialists had access to these resources at home. It enabled them to make contacts with potential customers at all times during the day. Making sales to potential customers was the crux of a Specialist's duties. Thus, working from home became a routine part of their employment. This further increased the total number of overtime hours worked by Plaintiffs and other Specialists.

144.    Plaintiffs and other Specialists worked overtime for other reasons. They routinely worked hours outside of their schedules in order to make up for past or current deficits. Making

up for these deficits caused Plaintiffs and other Specialists to regularly come in early and stay late. These conditions also caused them to frequently work on their days off.

145. Specialists were disciplined for not meeting Defendants' minimum sales goals. To avoid disciplinary action, Plaintiffs and other Specialists were required to sell a minimum of thirty-five (35) EVPPs each month. Meeting this requirement was an arduous task. It forced Plaintiffs and other Specialists to work hours outside of their schedule.

146. If Specialists failed to meet the minimum threshold for two (2) consecutive months, they were labeled as an "employee at risk." If an employee at risk failed to reach the thirty-five (35) EVPP minimum for a third (3rd) month, the employee was terminated.

147. Fear of termination caused Plaintiffs and other Specialists to work extra hours. This threat caused them to routinely work hours outside of their schedule. This included working additional days.

148. As a result of these conditions, Plaintiffs and other Specialists worked well over forty (40) hours each week. They consistently worked as many as fifty-five (55) to sixty-five (65) hours each week. There were times when they worked even more.

149. Despite the fact that Plaintiffs and other Specialists consistently worked over forty (40) hours each week, they never received overtime compensation.

150. Plaintiffs' and other Specialists' bonuses should have been added to their piece rate compensation in order to calculate their regular hourly rates. Plaintiffs and other Specialists were entitled to overtime compensation based on those rates.

151. Consequently, Plaintiffs and other Specialists were not compensated at a rate of "time and a half" their regular rates of pay. This occurred for the duration of their employment.

152. There is no bona fide dispute that Plaintiffs and other Specialists are owed overtime wages for all hours worked over forty (40) in a workweek.

26

153.    The duties performed by Plaintiffs and others similarly situated did not implicate any exemptions contained within the FLSA, MWHL or the MWPCL.

154.    Although Defendants did not require Plaintiffs or other Specialists to keep track of their time, Defendants were well aware of the excessive hours that its Specialists worked. Defendants monitored the time that all of its Specialists made their first call and tracked the time and duration of the last call made by each Specialist.  This was true regardless of whether a Specialist was working at the office or from home.

155.    Thus, Defendants knew that Plaintiffs and other Specialists customarily worked well over forty (40) hours per week.

156.    Defendants suffered and/or permitted Plaintiffs and other similarly situated employees to work these overtime hours.

157.    Acting without good faith, Defendants withheld the overtime wages owed to Plaintiffs and other Specialists, even after they inquired about the wages missing from their pay-checks.

158.    Consequently, on behalf of themselves and all those similarly situated, Plaintiffs seek the wages to which they are entitled and other available relief through this Complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

159.    Plaintiffs and other similarly situated employees work or worked as Extended Vehicle Protection Plan Specialists (hereinafter, "EVPP") and Vehicle Protection Specialists (hereinafter, "VPS") (hereinafter, collectively referred to as "Specialists") for Defendants.  They were all employed to sell Defendants' primary product: EVPPs.

160.    The FLSA requires employers to compensate non-exempt employees such as Plaintiffs and others similarly situated with overtime wages for all hours worked over forty (40) in a workweek.

161.     Defendants knew that Plaintiffs and other similarly situated employees did not qualify for any exemption to the FLSA's overtime provisions.

162.     Defendants knew that Plaintiffs and similarly situated employees typically worked over forty (40) hours per week.

163.     Defendants suffered and/or permitted Plaintiffs and other Specialists to work more than forty (40) hours per week.

164.     Defendants knew or should have known that Plaintiffs and other similarly situated employees were entitled to overtime pay for all hours worked over forty (40) in a workweek.

165.     Regardless of the number of hours Plaintiffs and other similarly situated employees worked, Defendants did not pay them any additional pay for working over forty (40) hours.

166.     Pursuant to the FLSA, Plaintiffs commence this collective action against Defendants on behalf of themselves and those similarly situated.

167.     Plaintiffs demand damages reflecting an overtime rate of not less than one and a half (1.5) times their regular rate of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations.  Plaintiffs make these same demands on behalf of all members of the putative Collective class.

168.     Plaintiffs consent to be party Plaintiffs in this matter.  Plaintiffs' consent forms are attached to this Complaint as Exhibits A-C.

169.     It is likely that other individuals will join Plaintiffs during the litigation of this matter and file written consents to "opt in" to this collective action.

170.     There are numerous similarly situated current and former employees of Defendants that have been harmed by Defendants' common scheme to underpay its employees and violate the FLSA. They are thereby fit for membership in the Collective class of similarly situated employees.

28

171.    These similarly situated persons are known to Defendants and are readily identifiable through Defendants' records.

172.    Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit as members of the Collective class.

173.    Upon information and belief, other similarly situated employees will choose to join Plaintiffs in this action against Defendants and opt in to this lawsuit to recover unpaid wages and other available relief.

## CLASS ACTION ALLEGATIONS UNDER MARYLAND WAGE LAWS

174.    Plaintiffs bring this action Pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and other current and former employees that served as Specialists for Defendants and were subject to the following practices and policies:

175.    Denial of overtime wages under MWHL for hours worked over forty (40) in a single workweek; and

176.    Denial of all wages owed to Plaintiffs and other similarly situated Specialists at the termination of their employment in violation of the MWPCL.

177.    The classes Plaintiffs seek to represent are defined as:

*MWHL Class*

> All individuals who are or were employed by Defendant as Specialists for any period ranging from October 5, 2014 to the present and who were not paid an overtime rate of "time and a half" their regular rate for all hours worked over forty (40) in a workweek, in violation of MWHL.

*MWPCL Class*

> All individuals who were, but are no longer, employed by Defendant as Specialists for any period ranging from October 5, 2014 to the present, who were not paid an overtime rate of "time and a half"

29

their regular rate for all hours worked over forty (40) in a workweek, in violation of MWHL and the FLSA, and thus did not receive all wages owed to them before the termination of their employment, in violation of the MWPCL.

178. *Numerosity:* The individuals in the class are sufficiently numerous that joinder of all members is impracticable. Although the precise number of such individuals is currently unknown, on information and belief, the class includes dozens of employees who are readily identifiable through Defendants' pay records. Defendants employed dozens of Specialists across the state of Maryland. Defendants service hundreds of customers throughout Maryland and across the United States through its Specialists. Consequently, numerosity exists.

179. *Commonality:* There are questions of law and fact common to the classes. Among the common questions of law and fact applicable to Plaintiffs and the classes are:

a. Whether the MWHL Class is similarly situated because they were subject to Defendants' common payment policies and practices;

b. Whether Defendants employed the MWHL Class within the meaning of MWHL;

c. Whether Defendants violated MWHL by failing to pay Plaintiffs and the MWHL Class overtime compensation for hours worked in excess of forty (40) hours per workweek;

d. Whether Defendants' violations of MWHL were willful;

e. Whether Defendants employed the MWPCL Class within the meaning of the MWPCL;

f. Whether Defendants failed to provide Plaintiffs and other members of the MWPCL Class with all wages due at the time their employment ended in violation of the MWPCL;

g. Whether Defendants' violations of MWPCL were willful; and

    h.   Whether Defendants are liable for damages claimed herein, including but not limited to, compensatory, liquidated or treble, statutory, interest, costs and attorneys' fees.

180. *Typicality:* Plaintiffs' claims are typical of those of the classes. Specifically, each and every class member of the MWHL Class and the MWPCL Class worked as a Specialist for Defendants. Each and every class member was required to work well over forty (40) hours per workweek to keep up with Defendants' imposed schedule and regular understaffing. Each class member was paid on a piece-rate basis. Each class member failed to receive extra compensation, regardless of whether the class member worked over forty (40) hours per week. Every member of the MWPCL Class failed to receive all wages owed to them at the end of their employment. As a result, each and every class member suffered the same harm. This was due to Defendants' failure to pay a proper overtime premium for all hours worked in excess of forty (40) hours per workweek and the subsequent failure to pay Plaintiffs and other members of the MWPCL Class all wages owed to them at the conclusion of their employment. This constitutes a direct violation of the MWHL, as well as a subsequent violation of the MWPCL.

181. *Adequacy:* Plaintiffs will fully and adequately protect the interests of the classes. They seek the same recovery as the class, predicated upon the same violations of the law and the same damage theory. Plaintiffs have also retained counsel who are qualified and experienced in the prosecution of statewide wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the classes.

182. *Predominance:* The common issues of law and fact predominate over any individual issues. Each class member's claim is controlled by Maryland's wage and hour statutory scheme and one set of facts. This is based on Defendants' failure to pay overtime as required by MWHL and its subsequent failure to pay all wages due at the end of an individual's employment as required by the MWPCL. Similarly, the damages are eminently certifiable in that Defendants' records will

provide the amount and frequency each class member was paid as well as the amount of time each class member worked.

183.    This action is maintainable as a class action.  The prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications with respect to individual members of the classes. This would establish incompatible standards of conduct for Defendants.  If they were to pursue their claims separately, the numerous adjudications that would be required to protect the individual interests of the class members would constitute a considerable drain and burden on judicial resources.

184.    Accordingly, the Court should certify the proposed classes.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

**Count I – *Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiffs, all Members of the Collective Class and All Those Appropriately Joined to This Matter***

185.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

186.    Plaintiffs are entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

187.    As described above, Plaintiffs have not received from Defendants compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

188.    Defendants willfully and intentionally failed to compensate Plaintiffs properly for the overtime wages they are owed.

189.    There is no bona fide dispute that Plaintiffs are owed overtime wages for work performed for Defendants.

190.    All members of the putative Collective are similarly situated to Plaintiffs and have suffered the same and/or similar harm resulting from the same policies and practices complained of in this Complaint.

191.    Under the FLSA, Plaintiffs and all members of the Collective are entitled to additional wages from Defendants to compensate them for hours worked in a workweek in excess of forty (40) at a rate of one and a half (1.5) times Plaintiffs' and each member of the Collective's regular hourly wage rate.

**Count II – *Violation of MWHL: Failure to Pay Overtime Wages to Plaintiffs, All Members of the MWHL Class and All Those Appropriately Joined to This Matter***

192.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

193.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

194.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-420(a), an employer shall compute the wage for overtime under Md. Code Ann., Lab. & Empl. § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

195.    Plaintiffs have not received compensation from Defendants reflecting the prescribed overtime wage rate for all hours worked in excess of forty (40) in a week.

196.    Defendants willfully and intentionally did not compensate Plaintiffs for the overtime wages they are owed.

197.    There is no bona fide dispute that Plaintiffs are owed overtime wages for work performed for Defendants.

198.    All members of the putative MWHL Class are similarly situated to Plaintiffs and have suffered the same and/or similar harm resulting from the same policies and practices complained of in this Complaint.

199.    Under MWHL, Plaintiffs and all members of the MWHL Class are entitled to additional wages from Defendants to compensate them for hours worked in a workweek in excess of forty (40) at a rate of one and a half (1.5) times Plaintiffs' and each member of the MWHL Class' regular hourly wage rate.

**Count III – *Violation of the MWPCL: Failure to Pay Plaintiffs, All Members of the MWPCL Class their Wages Owed at the Termination of their Employment and All Those Appropriately Joined to This Matter***

200.    Plaintiffs hereby fully incorporate in this Count all allegations contained within Plaintiffs' Complaint.

201.    Plaintiffs are entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501 et seq., which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.

202.    In accordance with §3-505(a), Plaintiffs have not received compensation from Defendants for all wages owed for work performed before the termination of their employment. This is specific to Defendants' failure to pay Plaintiffs the overtime wages they are entitled to. Similarly, Defendants failed to pay the members of the MWPCL Class correctly. They were paid in the same manner as Plaintiffs.

34

203.   Defendants willfully and intentionally did not compensate Plaintiffs or the members of the MWPCL Class with the wages owed to them and continued to violate the MWPCL, even after Plaintiffs informed Defendants of the violation.

204.   All members of the MWPCL Class are similarly situated to Plaintiffs and have suffered the same harm resulting from the same policies and practices complained of in this Complaint.

205.   Under the MWPCL, there is no bona fide dispute that Plaintiffs and the MWPCL Class are owed wages for work performed while employed by Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and others similarly situated, pray for the following relief:

a)   In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiffs and those similarly situated;

b)   In accordance with Rule 23 of the Federal Rules of Civil Procedure, designation of this action as a class action on behalf of Plaintiffs and members of the classes certified by motion during the course of this litigation;

c)   Ordering Defendants to disclose in computer format, or in print if no computer readable format is available, the names, addresses and emails of all those individuals who are similarly situated and permitting Plaintiffs to send notice of this action to all those similarly situated individuals;

d)   Designating the named Plaintiffs to act as class representatives on behalf of all similarly situated employees for the FLSA collective class;

e)   Designating the named Plaintiffs to act as class representatives on behalf of all members of the Maryland state law classes certified during the course of this litigation;

f)   Judgment against Defendants for their failure to pay Plaintiffs, those appropriately joined to this matter and those similarly situated in accordance with the standards set forth by the FLSA;

g)  Judgment against Defendants for their failure to pay Plaintiffs, those appropriately joined to this matter and members of the MWHL Class in accordance with the standards set forth by MWHL;

h)  Judgment against Defendants for their failure to pay Plaintiffs, those appropriately joined to this matter and all members of the MWPCL class in accordance with the standards set forth by the MWPCL;

i)  Judgment against Defendants and classifying their conduct as willful and not in good faith;

j)  Judgment against Defendants and classifying Plaintiffs, the collective class, those appropriately joined in this matter and members of all classes certified as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

k)  An award against Defendants for the amount of unpaid overtime wages owed to Plaintiffs, those similarly situated and members of all classes certified, calculated at a rate that is not less than one and a half (1.5) times Plaintiffs', all other similarly situated employees' and members of all certified classes' regular hourly rate for all overtime hours worked;

l)  An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiffs, those similarly situated and members of all classes certified during the course of this litigation, whichever is deemed just and equitable by this Honorable Court;

m)  An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendants;

n)  Leave to add additional plaintiffs to all claims by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

o)  All further relief deemed just and equitable by this Honorable Court.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request that a jury of their peers hear and decide all possible claims brought on behalf of Plaintiffs and those similarly situated.

Respectfully submitted,

*/s/ Benjamin L. Davis, III*

Benjamin L. Davis, III, Esq. (29774)
bdavis@nichollllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.: (410) 244-8454

*Attorney for Plaintiffs*